DAOUST & WELCH v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY CO., Appellant.

**Railroads:** SHIPMENT OF FREIGHT: DELAY: EXCUSE. A railway company having provided sufficient help to handle ordinary traffic is not required to provide help in advance to handle an extraordinary amount of traffic, yet if it accepts freight without notice to the shipper of the congested condition of the traffic and its possible inability to handle same promptly, so that the shipper might exercise his judgment regarding the advisability of then making the shipment, it can not, as attempted in this case, excuse a delay in delivery on the ground that it was required to withdraw from the freight service a portion of its help to handle an extraordinary passenger traffic.

**Same:** INSTRUCTION. A requested instruction in this case that if it was the custom of the defendant to forward stock, having a certain destination, from a feeding station by the same train from which it was unloaded for feed and rest, the defendant would not be required to forward the same by an earlier train, was properly refused because overlooking a previous delay of the train and its consequences.

**Same:** DELAY IN SHIPMENT: NEGLIGENCE. Where, as in this case, the stock had been on the train but a short time and the shipper could reasonably rely on the train leaving another station ahead on schedule time, at which they were unloaded for feed, in which event the stock would have gone to its destination within the statutory feeding time, the question of whether the shipper was negligent in not permitting them to be unloaded for feed and rest at the former station when the defendant offered to do so, and

if so, whether such negligence contributed to the delay in shipment, were for the jury.

**Same.** In view of the fact that the train on which the stock was shipped had been delayed at a prior station, and of the congested condition of passenger and freight traffic, the question of whether the stock could have been reloaded and forwarded from a later station, at which it was unloaded for feeding and rest, in the exercise of due care was for the jury.

**Shipment of stock:** NEGLIGENCE OF SHIPPER: EVIDENCE. The question of whether defendant was negligent in shipping and forwarding the stock when he did is held under the evidence to have been for the jury.

*Appeal from Pottawattamie District Court.*—Hon. O. D. Wheeler, Judge.

Saturday, December 17, 1910.

Action for damages caused by the negligent delay in the shipment of four carloads of horses. There was a judgment against defendant, from which it appeals.— *Affirmed.*

*Carroll Wright, J. L. Parrish,* and *Saunders & Stuart,* for appellant.

*Fremont Benjamin* and *Verne Benjamin* for appellee.

Ladd, J.—The horses were shipped from Goodland, Kan., July 3, 1908, at 5:50 p. m., billed to South Omaha via Lincoln. Upon their arrival at Lincoln July 6th at 12:45 a. m., the yards were inundated with water. Between 8:20 o'clock and 1:30 a. m. of that day, 3.86 inches of water fell, and this was increased to 5.7 inches by 6 o'clock. Between 10 o'clock in the forenoon and 12:30 p. m., 1.6 inches of water fell. Conditions were such that it was impossible to unload the horses or move the train

until July 7th at 9 a. m., when it was taken to South
Omaha, reaching that place at 2:39 p. m., where the horses
were immediately unloaded. It was conceded on the trial
that the company was not responsible for the delay after
the arrival of the train at Lincoln; this, as the court
instructed, being due to an act of God. The controversy
is whether there was unreasonable delay in the shipment
of these horses from Goodland, Kan., to Lincoln, Neb., a
distance of three hundred and twenty-five miles in fifty-five
hours, and, if so, whether if transported with reasonable
promptness they would have passed through Lincoln in
time to have avoided the flood. If they would, then, under
the rule announced in *Green-Wheeler Shoe Co. v. Railway,*
130 Iowa, 123, the plaintiff was entitled to recover. As the
time greatly exceeded that scheduled and ordinarily re-
quired, counsel concede that the burden was on defendant
to explain the delay consistently with the exercise of ordi-
nary diligence in transporting the stock.

I. The horses were shipped from Goodland, Kan.,
July 3, 1908, at 5:50 p. m. Central time. The train was
late in leaving that point and arrived at Phillipsburg, Kan.,
at 10:35 o'clock, the same evening, two
hours and twenty-five minutes behind sched-
uled time. The crew required rest, and

1. RAILROADS:
shipment of
freight: delay:
excuse.

there was no other to go in its stead. The scheduled time
for leaving was 11 o'clock p. m., three hours being allowed
for yard work, but a stop was made until 7:12 a. m.
the next morning, when the train pulled out for Fairbury,
Neb., where it arrived in the afternoon at 4:15. This was
fifteen minutes ahead of scheduled time, which fixed the
time for departure at 6:30 p. m. At the instance of the
chief train dispatcher, the horses were unloaded, fed, and
watered. The train crew was ordered out at 10:30 o'clock,
but the train did not leave until 11:25 p. m. It arrived
in South Omaha at 7:28 o'clock the next morning. The
horses were not shipped out on this train, though more

than the six hours exacted for rest of the animals by the United States statute had elapsed. Nor was the train ordinarily leaving Fairbury at 10:30 a. m. of July 5th run that day, and the horses were not reloaded and moved until 7:02 p. m. of that day. In explanation of these delays, the evidence disclosed that the delay at Phillipsburg was owing to there being no crew not entitled to rest under the statutes of the United States prohibiting more than sixteen hours' continuous employment on trains, and after such service exacting at least eight hours' rest, to take the train and continue the journey. For this reason, it did not leave that place until 7:12 o'clock the next morning. The company had in its employment a sufficient number of crews to handle the ordinary and usual freight and passenger traffic over its road. But there was an extraordinary movement of passengers over the line from Council Bluffs, Iowa, via Lincoln, to Denver, Colo., beginning July 2d owing to the National Democratic Convention convening there July 7th, and during the four days commencing the 2d, besides the regular passenger service, defendant operated twenty-one passenger trains over this line. Fourteen of the twenty-six freight crews, under the direction of the train dispatcher at Fairbury, were withdrawn from the freight service and sent to Council Bluffs to take charge of passenger trains as they came in and operate them through to Denver. It was shown not to have been feasible to have procured crews from other parts of defendant's railroad system or from other systems, for that, in safe operation it is essential that the men be familiar with the road, the equipment of trains, the timecards, grade, bridges, and the like, and considerable time is necessary to acquire this information. The naked inquiry with reference to the delay at Phillipsburg, then, is whether defendant was excusable therefor on the ground that the company had diverted the crews ordinarily and necessarily engaged in the transportation of freight to the operation of its passen-

ger trains necessary to move the extraordinary and unusual number of passengers demanding transportation.

We can think of no rule of law which will permit a carrier thus to abandon the carriage of freight which it has received for the purpose of transporting persons. The company had anticipated the exodus to Denver and planned for it during the month previous; but it continued to receive freight without notice to the shipper of its purpose to cripple that service and notwithstanding its knowledge that the withdrawal of more than one-half the freight crews would be likely to occasion unusual delays in the carriage of freight. Though a common carrier, which has equipped itself with sufficient facilities and appliances to enable it to transport the traffic which may be ordinarily expected to seek transportation over its route is not bound to provide in advance for extraordinary occasions for an unusual influx of business, and may refuse to accept goods owing to the unusual press of business, yet, if it accepts goods or stock without notice to the shipper of the circumstances or his assent, it cannot be heard to say that a delay is due to such a contingency. Hutchinson on Carriers (4th Ed.) section 496. That author lays down the rule that the carrier "must at his peril inform the shipper of the necessary delay, that the shipper may exercise his own discretion as to the propriety of making the shipment; and even though the delay may occur from such a cause upon a connecting route over which he has bound himself to carry the goods to destination, which may be known to him at the time of their acceptance, he is liable for any unreasonable delay in the transportation, and such unavoidable difficulty, though wholly unknown and unanticipated, will not excuse him." The principle is well stated in *Russell Grain Co. v. Railway Co.,* 114 Mo. App. 488 (89 S. W. 908): "When, at the time the shipper offers freight to the carrier, conditions exist that will prevent the delivery within a reasonable time, which means the time

usually consumed under ordinary circumstances, different principles control. The carrier is not expected to perform the impossible, and may refuse to accept freight unless the shipper will agree to suffer delay in delivery made necessary by the extraordinary conditions. But the acceptance of goods for shipment, without such stipulation or without notifying the shipper of the fact that they can not be promptly delivered, is tantamount to an assurance that they will be delivered within a reasonable time, except for the intervening of excusing causes of subsequent occurrence. The burden then devolved upon the carrier to show that the delay was caused either by some fortuitous happening that excuses delay, or that the shipper was informed, before delivery to the carrier of the fact that prompt delivery could not be made." *Palmer v. Ry.,* 101 Cal. 187 (35 Pac. 630); *Texas & N. O. Ry. Co. v. Kolp* (Tex. Civ. App.) 88 S. W. 417. Even then if it were conceded that defendant might properly divert its employees from the operation of freight trains to the handling of the extraordinary movement of passengers, it was bound, in receiving freight for transportation, to advise the shipper of the situation in order that he might exercise his discretion as to whether he would then turn his property over to the carrier or later, and, not having done so, the extraordinary demand on its service in transporting passengers furnished no excuse for delay in carrying plaintiff's horses.

II.   Exception is taken to the refusal of the court on request of defendant to instruct the jury that: "If you find from the evidence that it was the custom of the defendant to forward on train No. 94 the stock with South Omaha destination that was unloaded for feed, water, and rest at Fairbury, and that came in on train No. 94 of the preceding evening, the defendant, in the absence of instructions from the plaintiff would not be required to forward the same on an earlier train." The instruction as requested overlooked the previ-

2. SAME: instruction.

ous delay at Phillipsburg, Kan., and also that No. 94, instead of leaving on scheduled time, 6:30 p. m.—after the horses had been unloaded but two hours and fifteen minutes—rendering it necessary that they await another train ordinarily, did not leave Fairbury, Neb., until 11:25 p. m., after the six hours exacted by the United States statute for rest had elapsed. Because of these circumstances, the court rightly refused the instruction.

III. Appellant complains also of the refusal of the court to instruct that if defendant's yardmaster at Phillipsburg offered to unload the horses at that point for feed, water, and rest, and those in charge of the shipment refused such offer and insisted this was unnecessary, and that such refusal rendered unloading at Fairbury necessary and precluded running the cars without unloading from Phillipsburg to South Omaha, a verdict should be returned for defendant. When the horses reached Phillipsburg, Kan., they had been in the cars only about five hours, and the man in charge knew nothing of the delays likely to occur on the way. They might well have reckoned on the train leaving Fairbury at 6:30 p. m., in which event, had it moved on according to scheduled time, it would have reached South Omaha before 3 o'clock the following morning. This would have been two hours and thirty minutes within the thirty-six-hour limit for keeping stock in the car. Manifestly whether those in charge of the horses were negligent in not unloading at Phillipsburg, and, if so, whether such negligence contributed to the delay, were issues for the jury to decide.

3. SAME: delay in shipment: negligence.

IV. Defendant also requested and the court refused to instruct that defendant was under no obligation to take the horses from the stockyards at Fairbury prior to the time it did. The instruction was rightly refused. But for the delay at Phillipsburg, the possibility of reloading and moving the horses out the same evening, and the circumstances that the 10:30 o'clock

4. SAME.

train the next morning would not leave the instruction might have been given.  As the train had been delayed, and the horses might well have been reloaded and moved out the same evening, and many passenger trains would be on the road the next day, whether the horses should have been taken out of Fairbury sooner than they were was for the jury to decide.

V.   The exception to the twenty-sixth instruction is not well taken, and the criticism of others has been disposed of by what has been said.  The contention that the evidence was not sufficient to carry the issue as to defendant's negligence to the jury is not borne out by the record.  The horses did not reach Lincoln until fifty-five hours after leaving Goodland, but nineteen hours and thirty-one minutes of which they were being transported.  Though a portion of this time was Sunday, no part of the delay was shown to have been due to this, and as defendant was operating trains on that day, including that on which the horses were taken out of Fairbury, it is not in a situation to insist that this ought to be taken into account.  In view of the entire record, it can not be said as a matter of law that the company was not negligent in unreasonably delaying the shipment, but for which the flood at Lincoln would have been avoided.

5. SHIPMENT OF LIVE STOCK: negligence of shipper: evidence.

That the horses were in good condition when loaded on the cars at Goodland is not controverted, but concerning their condition on arrival at South Omaha the evidence was in conflict; that of plaintiff tending to show that they were gaunt, weak, bruised, had lost about two hundred pounds each in weight, many of them lame, and that they were unfit for market, while that of defendant indicated that, aside from being gaunt, they were in salable condition.  The issue so raised was for the jury to determine, as was also the extent of damages occasioned by the delay.

We have discovered no error in the record, and the judgment is *affirmed*.