## DAVIS v. GRAHAM
(No. 1096, April 29th, 1924; 225 Pac. 789.)

CARRIERS—CARE OF LIVESTOCK IN TRANSIT—UNAVOIDABLE ACCIDENT OR DELAY—OWNER ATTENDING SHIPMENT—UNLAWFUL CONFINEMENT—EVIDENCE—BURDEN OF PROOF—PRIMA FACIE NEGLIGENCE—PRESUMPTION OF NEGLIGENCE—UNUSUAL TRAFFIC CONGESTION ARISING AFTER SHIPMENT—PROOF OF MARKET VALUE—PROOF OF SHRINKAGE—PROOF OF WEIGHTS—APPEAL AND ERROR—INSTRUCTIONS UPON MEASURE OF DAMAGES—INTEREST.

1. Verdict for plaintiff in action for damages for delay in shipment of cattle *held* sustained by evidence.
2. That owner by arrangement with carrier accompanies stock does not relieve carrier from duty to unload, feed, and water in absence of specific agreement that owner would care for stock, under Act Cong. June 29, 1906 (U. S. Comp. St. §§ 8651-8654), and that without request of owner.
3. Failure to unload, feed, and water cattle, as required by Act Cong. June 29, 1906 (U. S. Comp. St. §§ 8651-8654), is negligence per se, rendering carrier liable to owner, in absence of storm or other accidental causes; ''other accidental causes'' meaning other unavoidable accidental causes.
4. Owner attending stock in shipment need not show that carrier acted negligently in confining stock more than 36 hours in violation of Act Cong. June 29, 1906 (U. S. Comp. St. §§ 8651-8654).
5. An unavoidable cause excusing delay in shipment of stock does not necessarily exculpate a carrier from liability for

confining cattle more than 36 hours, under Act Cong. June 29, 1906 (U. S. Comp. St. §§ 8651-8654).

6. In action for damages for failure to unload, feed, and water cattle for more than 36 hours, in violation of Act Cong. June 29, 1906 (U. S. Comp. St. §§ 8651-8654), *held,* that defendant did not sustain burden of proving legal excuse.

7. When evidence of unusual delay in shipment of stock is adduced, a prima facie case of negligence is made out, and burden then devolves on carrier to explain delay, even though shippers accompany shipment, unless, at least, delay was within exceptions of contract with shipper.

8. Presumption of negligence of carrier arising from delay in shipment of stock can be rebutted and explained.

9. A carrier is not liable for delay caused by unexpected extraordinary and unusual influx of freight arising subsequent to making of contract.

10. Allowing trains to pass, delay due to hot box, changing of crews and other circumstances are not excuses for delay in shipment of stock as matter of law, under Act Cong. June 29, 1906 (U. S. Comp. St. §§ 8651-8654).

11. A claim to knowledge of price of cattle on market on certain day may reasonably be regarded as prima facie sufficient to show witness to be competent, even though there be evidence that witness was not at market on day in question, it being assumed that he gathered his knowledge from reliable sources.

12. Evidence as to shrinkage of cattle due to delay in shipment *held* sufficient to support verdict.

13. Evidence that cattle shipped weighed a certain amount was objectionable as hearsay, where witness did not weigh the cattle personally, and did not see them weighed, but was not prejudicial.

14. Whether plaintiff was qualified to testify as to weight of 18 carloads of cattle without weighing them *held* for jury.

15. Refusal of instruction was not error where court gave an instruction, covering subject-matter, which was more favorable.

16. In action for damages for delay in shipment of stock and shrinkage, failure of court to instruct on measure of damages was not reversible error, such measure being simple and no instruction being requested.

17. Measure of damages for delay in shipment of stock and shrinkage is difference between value at time and place

of delivery in uninjured condition and value in depreciated condition in which they are delivered, which in some cases is value of excess shrinkage, and also difference in market price between date when stock should have arrived and date it did arrive.

18. Shipper is entitled to recover interest on damages caused by delay in shipment of stock and shrinkage.

Error to District Court, Fremont County; Cyrus O. Brown, Judge.

Action by James M. Graham against James C. Davis, Agent of the United States Railroad Administration to recover damages, for delay and shrinkage in shipment of livestock. There was judgment for plaintiff and defendant brings error.

*P. B. Coolidge* and *Wymer Dressler* for plaintiff in error.

Shipment accompanied by caretaker places burden of proof upon plaintiff as to negligence of carrier in handling the shipment, Starr v. Ry. Co., 163 N. W. 682; Cleve v. Ry. Co., 77 Neb. 168; Ry. Co. v. Williams, 61 Neb. 608; Ry. Co. v. Schuldt, 66 Neb. 43; an action based on negligence relieves carrier as insurer, Colsch v. Ry. Co., 127 N. W. 198; the rule has special application where owner contracts to unload and feed the stock, Hanley v. Ry. Co., 134 N. W. 417; Ward v. Ry. Co., 137 N. W. 995; Ry. Co. v. Ward, 147 S. W. 949; McCampbell v. Ry. Co., 150 S. W. 987; Bowers v. Ry. Co., 135 N. W. 1017; nothing in the 28 hour law prevents owner from furnishing feed for stock shipment, Webster v. Ry., 200 Fed. 597; carrier has a right to rely upon caretaker for notice of needs of shipment, Jefferies v. Ry. Co., 88 Neb. 268; Fluckinger v. Ry. Co., 154 N. W. 865; the shipment was handled in the usual and ordinary time, defendant's schedules are presumed to be reasonable, Payne v. Ry. Co., 99 Neb. 699; extraordinary means of shipment are not required, Tiller & Smith v. Ry. Co., 142 Ia. 309; Janesville Co. v. Hines, 178 N. W. 739; Burnes v. Ry. Co., 104 Wis. 646; there was no evidence of damage resulting from delay in furnishing cars for shipment; furnishing of

cars is transportation, Ry. Co. v. Elev. Co., 226 U. S. 426;
Ry. Co. v. Prescott, 240 U. S. 632; a promise of special
service is void, Ry. Co. v. Kirby, 225 U. S. 155; Ry. Co. v.
Milling Co., 241 U. S. 190; an agent has no lawful right
to make a specific agreement for cars at a certain time, Un-
derwood v. Director General, 222 S. W. 1037; Bradford v.
Director General, 227 S. W. 889; there was no competent
evidence as to weight of shipment at loading point, U. P.
Ry. Co. v. Perrine, 267 Fed. 657; instruction number 2 was
erroneous; the verdict is contrary to instructions numbered
4, 7 and 8; the court erred in refusing requested instruction
11; and in refusing to instruct on measure of damages, 14
R. C. L. 727; the court erred in refusing a new trial.

*John Dillon* and *G. J. Christie* for defendant in error.

It was unnecessary for plaintiff to prove negligence, 10
C. J. 122; 4 R. C. L. 949; defendant was an insurer, Ry.
Co. v. Blyth, 19 Wyo. 419; 10 C. J. 376; there was no evi-
dence of a special agreement by owner to care for ship-
ment, 10 C. J. 381; proof of delivery to carrier makes
prima facia case, 4 R. C. L. 993; allegations of negligence
were superfluous, 10 C. J. 360; defendant failed to comply
with the Federal Statutes, 4386 U. S. R. S.; the shipment
was interstate; the fact that owner accompanied shipment
on same train does not relieve carrier from duty to feed
and care for shipment in absence of special agreement, 10
C. J. 95-98; 4 R. C. L. 979-983; defendant failed in the de-
gree of care required by the circumstances, 29 Cyc. 415;
negligence is question for the jury, 20 R. C. L. 166; failure
to observe Federal statute is sufficient to go to the jury, Ry.
Co. v. Simpson Bros. 23 Wyo. 320; justifiable delay must
be shown by carrier, 10 C. J. 300; Ry. Co. v. Simpson
supra; carrier may decline shipment because of congestion,
but having accepted it with knowledge of conditions can-
not excuse delay on ground of press of business, 10 C. J.
290; Davirst v. Ry. Co., 34 L. R. A. (NS) 637; plaintiff's
testimony as to weight was not incompetent; 10 R. C. L.

955; Carland v. Tel. Co., 43 L. R. A. 280; U. P. Ry. Co. v. Perrine, 267 Fed. 657; instruction number 2 was not erroneous, Ry. Co. v. Simpson Bros, supra; the verdict is not contrary to instruction 8; refusal to direct verdict was not error; requested instruction 11 was covered by instruction 8, given by the Court, Edwards v. Murray, 5 Wyo. 153; a demand based on market value, subject to easy proof, though unliquidated is subject to interest claims, Kuhn v. McKay, 7 Wyo. 65; 10 C. J. 400; questions as to admission of evidence are not properly before the court for review, Ry. Co. v. Morrison, 16 Wyo. 309; Imp. Co. v. Bradley, 7 Wyo. 228.

*P. B. Coolidge* and *Wymer Dressler* in reply.

Time consumed in transportation in excess of schedules, is a mere presumption of negligence that may be overcome by proof, N. S. F. Co. v. Ry. Co., 179 N. W. 503; defendant's explanations justifying delay remain unchallenged, the verdict is apparently based on sentiment to help stockmen; there is no basis in law for holding a carrier liable for delay unless due to carrier's negligence.

BLUME, Justice.

This is an action by James Graham, plaintiff below and defendant in error here, against the Agent of the United States Railroad Administration, on account of damages sustained for delay of a shipment of 18 cars of cattle shipped from Riverton, Wyoming, to South Omaha, Nebraska, on the Chicago & Northwestern Railroad. The sum of $906.30 and interest is claimed on account of the difference in the market value of the cattle on October 14, 1919 and on October 13, 1919, the time when, it is claimed, the cattle should have arrived. A further sum of $1224.75 and interest is claimed on account of excess shrinkage of the cattle arising from the delay and from the fact that the cattle were kept forty-six hours in the cars without feed or water in violation of the laws of the United States. The jury

allowed the plaintiff's claim in full, with interest, and defendant brings proceedings in error.

Plaintiff testified that the normal running time for taking cattle from Riverton to Omaha would be sixty hours; that his cattle left Riverton on Friday afternoon at 1.30 p. m. October 10, 1919, and should have arrived at Omaha at 1.30 Monday morning, October 13, 1919. Mr. Dickson, the foreman of the yards of defendant at Long Pine, testified that the regular and ordinary stopping place for feeding and watering cattle which came from Riverton was Long Pine, Nebraska. The other evidence of the defendant shows that, according to the railroad schedule then in force, the straight running time from Lander to Omaha was fifty-five hours and ten minutes, which would be about fifty-four hours from Riverton to Omaha. Stops of one hour each are, in the schedule, allowed at Casper, Chadron, Norfolk and Fremont. If cattle are fed and watered at Long Pine, an additional time, from 5 a. m. to noon is given, making a further period of seven hours. This makes a total time of sixty-five hours from Riverton to Omaha, and if the cattle in question had been carried according to this schedule, the cattle would have arrived at South Omaha approximately at 6.30 a. m. on Monday, October 13, 1919, presumably amply early for the market on that day. The cattle actually arrived about 10 o'clock on Monday night and were sold on the market the following day. Most of the delay occurred at Long Pine, Nebraska. The cattle arrived at that place at 4.30 on Sunday morning, were not unloaded until 11.30 a. m., when they had been in the cars for forty-six hours without feed or water, and left Long Pine at 11 p. m. of that day.

A number of errors are assigned, among which is one that the verdict is not sustained by the evidence. This assignment of error, however, is closely interwoven with and dependent on the law applicable thereto, which is in dispute and which we shall consider in connection therewith. Other assignments of error, such that the court erred in not in-

structing the jury to return a verdict in favor of defendant, and that the verdict is contrary to certain instructions, is embraced in the foregoing and need not be considered separately. We shall turn our first attention directly to the subject of the confinement of the cattle in the cars for forty-six hours without feed or water, although the subject of delay in transportation in general, closely related to and partially embracing the former subject, will necessarily be touched upon in connection therewith.

1. The Federal Statute (37 Stat. at L. 607c. 3594 U. S. Comp. St. Supp. 1907, pp. 918, 919, Supp. 1909 pp. 1178, 1179) provides that no railroad company shall confine any cattle, sheep or swine for a period longer than twenty-eight consecutive hours, without unloading the same for rest, water and feeding for a period of at least five consecutive hours, unless prevented by storm or by other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight; provided that upon the written request of the owner or custodian thereof, the time for confinement may be extended to thirty-six hours. Sec. 2 of the act provides that animals so unloaded shall be properly fed and watered during such rest either by the owner or custodian, or, in case of his default in so doing, by the carrier. These provisions were violated, and it is the contention of counsel for defendant, as we understand it, that the latter is not responsible for any damages resulting therefrom for three different reasons; first, because plaintiff accompanied the stock and is himself responsible for the violation of the statute; second, that plaintiff must show negligence aside from showing the violation of the statute; and, third, that plaintiff has shown an ample excuse. We shall consider these points in their order.

(a) The cattle arrived at Chadron at 4.50 p. m., October 11, when they had been on the cars for twenty-seven hours and twenty minutes. They left Chadron at 7.30 p. m. when they had been on the cars for thirty hours. An extension

of time for confinement from twenty-eight to thirty-six
hours, permitted by law, was not signed until after the
train had left Chadron. The cattle arrived at Long Pine
at 4.30 the following morning, when they had been con-
fined thirty-nine hours. Counsel contend that the plaintiff,
as caretaker of the animals, should have requested the car-
rier to unload the cattle, and that in the absence of so do-
ing the carrier is not responsible. We are cited to Webster
v. Union Pac. R. R. Co., (D. C.) 200 Fed. 597; Jeffries v.
R. R. Co., 88 Neb. 268, 129 N. W. 273 and Fluckinzer v.
Ry. Co., 99 Neb. 6, 154 N. W. 865. In each of the cases the
shipper had agreed, by special contract, to unload, feed and
water the animals. In the case at bar no such agreement
is shown to have been made, and we do not think that in
the absence of such agreement the rule mentioned in the
cases cited applies. The rule of law is stated in 10 C. J. 95,
as follows:

"The fact that the owner of the stock, or his agent, by
arrangement with the carrier, accompanies the animals on
the same train, does not relieve the carrier from the duty
to feed and water and otherwise care for them, in the ab-
sence of a specific agreement that he would care for the
stock."

See Elliott on Railroads, (3rd Ed.) Sec. 2347. The rule
is not changed by the Federal statute above mentioned.
That statute only makes certain when and where the com-
mon law duty of the carrier for the preservation and com-
fort of the stock should be exercised. Louisville etc. R. Co.
v. Stiles, 133 Ky. 786, 119 S. W. 786, 134 A. S. R. 491.
And the rule is reasonable. Plaintiff did not have control
of the train or its movements and had no power to dictate
when and where it should stop to unload. He did not un-
dertake to look after the cattle and had a right to rely upon
the carrier doing its duty. The argument that he knew bet-
ter than the carrier whether his cattle needed water and
feed or not is more specious than sound. The fact that the

Federal Government prohibits confinement of cattle for more than thirty-six hours ought to sufficiently convey to the agents of the carrier the knowledge that such confinement is injurious. For the plaintiff to tell them so, would not give them any additional information. In the case of McAllister v. R. R. Co., 74 Mo. 351, 360, it was held that even a contract of the shipper to unload and take care of the stock gives him no right to decide when, where and under what circumstances the loading or unloading shall take place. In Southern Pac. Co. v. Arnett, 126 Fed. 75, 61 C. C. A. 131 a case where the shipper had agreed to unload and feed and water the livestock, Judge Sanborn, speaking for the court, said:

"Congress imposed the duty (to unload) upon the defendant regardless of the request or notice of the shipper. No sound reason occurs to us why the shipper can be deprived of his right to recover for damages which resulted from the failure of the defendant to discharge the plain duty imposed upon it by the law because the owner or shipper of the cattle did not make a demand upon the defendant that it should yield obedience to the law. The failure of a shipper to notify or to demand of a railroad company that it shall stop a train of stock, so he can water, feed and rest the cattle before they have been confined more than 28 hours is not necessarily fatal in all cases to his right to recover for damages caused by the confinement, if he has in no way requested or consented to the continued confinement and transportation of the stock."

See Elliott, supra, Sec. 2346. The duty to unload stock is by section one of the Federal act above mentioned imposed solely upon the carrier, and not upon the shipper jointly. Whether or not, however, the carrier could, notwithstanding that fact, impose the duty to unload upon the shipper, by special contract, and be then relieved from liability in the absence of a request to unload, as some of the cases appear to hold, need not be determined here. We are

clear that in the absence of such contract, no such request is necessary.

(b)    Counsel for defendant appear to contend that a shipper who attends his stock must show that the carrier was acting negligently in confining the stock for more than thirty-six hours; that is to say that the mere showing that cattle are confined for more than thirty-six hours does not in such a case give rise to a presumption of negligence. In that connection they complain of instruction No. 2 given by the court which told the jury that where cattle are confined more than thirty-six hours, and it is shown that damage has resulted therefrom, then that a "presumption of negligence on the part of defendant's servants and agents in charge of the cars arises," etc. A violation of the duty imposed by the statute above referred to is negligence per se, rendering the railroad company liable to the shipper for the resulting injuries to the animals. 10 C. J. 99; Elliott, supra, Sec. 2348. The carrier will be excused from performing this duty only by "storm or other accidental causes." "Other accidental causes" must be taken to mean other unavoidable accidental causes. An effect attributable to the negligence of the carrier is not an unavoidable cause. Chesapeake etc. Ry. Co. v. American Exchange Bank, 92 Va. 496, 23 S. E. 935, 44 L. R. A. 449. It is not claimed in this case that there existed any storm preventing the unloading of the cattle. Whether or not there were any other causes was a question peculiarly within the knowledge of the defendant, and to impose the duty on the shipper who accompanies his stock, to show that no legal excuse existed, would often be equivalent to a denial of justice. He cannot know the reasons of a congestion or the various causes for delay. A shipper may see a yard full of cars. He does not know whether the congestion could have been prevented by reasonable diligence or not, or whether the yard could be cleared within a reasonable time. If he should try to find out, he would, in all probability, be unsuccessful. Often the reasons are unknown even to the people at

the local yard, and the fact of the congestion at a particular place or the delay at certain points is frequently, if not generally, determined by men sometimes hundreds of miles away. We think it clear that the burden to show a legal excuse under the statute should be on the carrier notwithstanding the fact that the shipper may accompany the stock. The reasoning in the following cases is, we think, fully applicable to the case at bar. McElwain v. Union Pac. R. R. Co., 101 Neb. 484; 163 N. W. 845, 1 A. L. R. 533; Joliffe v. Northern Pac. R. Co., 52 Wash. 433, 100 Pac. 977; Eastern Elevator Co. v. Ry. Co., (Ok.) 219 Pac. 332.

(c) Counsel further claim that even though the burden to prove a legal excuse for not unloading the cattle within thirty-six hours rests on defendant, that burden has been met in the case at bar. The argument is based mainly, if not entirely, on the proposition that a legal excuse for delay in the transportation, including the delay at Long Pine, has been shown. We shall consider the general subject of delay a little later, but must pause here to say that an unavoidable cause excusing delay does not necessarily also exculpate a carrier from liability arising from the confinement of cattle for a period of over thirty-six hours, without rest, feed or water. The carrier must properly protect the property transported while en route, and that notwithstanding the fact that there are unavoidable causes excusing delays in the transportation, at least in the absence of a contract to the contrary and where such protection may be afforded by the exercise of reasonable care. Mitchie, Carriers, Sec. 1754, 1788; Elliott, Railroads, (3rd Ed.) Secs. 2235, 2347. In Nashville etc. Ry. Co. v. Heggie Brothers, 86 Ga. 210, 12 S. E. 363, 22 A. S. R. 453, it was held that the fact that the carrier's stockyards were on fire was not a sufficient excuse for not furnishing to the person in charge of the animals, under a contract, all proper facilities for taking care of the same, and that this might have been done at some other station. In the case of Interna-

tional & G. N. Ry. Co. v. Lewis (Tex. Civ. App.) 23 S. W. 323, the court said:

"The defense to the action seems to have proceeded on the ground that defendant was not liable because it had a great rush of business at Taylor, where it was shown that the damage occurred, so that defendant could not take proper care of the cattle while detained. There is no effort made by defendant to show that it exhausted its resources in getting a proper place for the cattle, even if its own stock pens were crowded; and there is no attempt to justify the keeping of these cattle confined for 25 to 30 hours, without water or food, in the cars. The railroad company, by reason of the rush of business, was not relieved of exercising proper care and diligence in seeing to the needs of animals on its train. It could have released the cattle from the cars, even if it had been compelled to herd them, or have rented a pasture or pens in which to keep them. It should at least have shown that it made some effort to take care of the cattle. Hutch. Carr. § 335. The cattle were placed in the hands of the common carrier to be transported to their destination, and it was responsible for their safe delivery, and, if the rush of business was such that the cattle were unavoidably detained, it was certainly its duty to properly care for them during the detention. 2 Harris, Dam. Corp. p. 919, § 800."

So in the case at bar. There is some evidence in the record that there are yards in Chadron, Nebraska, where the cattle might have been unloaded and cared for, and it would seem that if the yards at Long Pine were in fact as congested as claimed, that prudence would have suggested unloading them at the former place. Certainly no sufficient excuse for not doing so has been shown. Other reasons that defendant has not met the burden of proof of the point in question will appear in our discussion on the general subject of delay, which we shall now proceed to consider.

2. When evidence of unusual delay is adduced, as there was in the case at bar, a prima facie case of negligence is made out, and the burden then devolves on the carrier to explain the delay, and to show that it arose from some cause other than the carrier's negligence, or that of its agents or servants. 10 C. J. 310. And this is true whether the shipper or his agent accompanies the shipment or not, unless, at least, it is shown that the delay was within the exceptions of a contract with the shipper which qualifies the carrier's general liability, for the reason that the facts excusing the delay are mainly, if not entirely, within the special knowledge of the carrier. Railroad Co. v. Morris, 16 Wyo. 308, 93 Pac. 664; Joliffe v. Northern Pac. R. R. Co., supra. Counsel for defendant admit this principle of law, we believe, in their reply brief. The presumption of negligence arising when the evidence of unusual delay' has been adduced, can of course be rebutted and explained, as they claim. Has this been done in the case at bar? There was a delay of eighteen hours at Long Pine, but it is contended that the congestion of business at that place fully exonerates the defendant from liability therefor. The yard foreman of defendant testified that when plaintiff's cattle arrived at Long Pine, the railroad yard was crowded; that the number of cars handled between July 1st and January 1 in the average year had been about 10,000 cars; in 1919, 15,824 cars; that the month of October, 1919, was the heaviest month; that there were handled in those yards in the first week of October, 1919, 871 cars, the second week 975 cars, the third week 909 cars, the fourth week 668 cars; that all loading and unloading on October 12, 1919 was done as fast as possible; that there were three shift crews working; that there are 89 cattle pens in the yard, holding ordinarily 176 cars of cattle; that there were in the yard at 4.30 a. m. October 12, 103 cars of cattle unloaded; also one train of 25 cars that came in at 2 a. m., unloaded at 11 a. m., and one train of 19 cars that came in at 2.50 a. m., and unloaded at 9 a. m. He further testified that there were

reloaded at 5 a. m. 40 cars and none thereafter until 10 a.
m.   Plaintiff testified that when he arrived at Long Pine,
he immediately attempted to get the agents of the company
to unload the cattle, but that for four hours the men in the
yards were loafing and doing nothing.   That testimony, it
would seem, if credited by the jury, was sufficient to show
that at least for that length of time no sufficient excuse for
not unloading the cattle existed.   Whether we could dis-
turb the finding of the jury on the question under discus-
sion, even though it were clear that a valid excuse for the
remainder of the delay had been shown is a point not ar-
gued and we need not decide it.   See Elliott, supra, Sec.
2348.   If at the time of making a contract of shipment of
freight, a carrier has no doubt, and the condition of busi-
ness on its lines gives it no reason to doubt, that suitable
facilities will be at its command to transport cattle to its
destination within the usual and ordinary time, taking into
consideration the necessary and required care of any prop-
erty on the way, and the delay is occasioned by an extra-
ordinary and unusual influx of freight upon its lines, which
arises subsequent to the making of the contract, so that de-
livery, with proper diligence on its part, within a reason-
able time is thereby rendered impossible, the carrier is not
responsible for the delay.   But if at the time the contract
of shipment is made, there is already an accumulation of
business on the carrier's line, which incapacitates it, or
might reasonably be expected to incapacitate it, for trans-
porting and delivering the shipment within a reasonable
time, and this is then known to the carrier, or might have
been known by proper effort on its part, or if there are then
reasonable grounds for a belief on the part of the carrier
that such is the state of the case at the time, then the car-
rier is liable for the delay although, it is occasioned by the
accumulation of business, at least in the absence of notifica-
tion to, or the absence of knowledge of, the shipper of the
existence of the condition.   This statement of the law is
largely adapted from what was said in the case of Helliwell

v. Grand Trunk Ry., (C. C.) 7 Fed. 68, but is sustained, we think, by abundant additional authority; 10 C. J. 290-292; Elliott on Railroads, (3rd Ed.) Sections 2347-2349; Hutchinson, Carriers, (3rd Ed.) Sec. 496; Thomas v. Ry. Co., (C. C.) 63 Fed. 200; Dawson v. R. R. Co., 79 Mo. 296; Yazoo & Miss. V. R. Co. v. Blum, 88 Miss. 180; 40 So. 748, 10 L. R. A. (N. S.) 432; I. C. R. Co. v. Cobb, Christy & Co., 64 Ill. 128; Daoust v. C. R. I. & P. R. Co., 149 Ia. 650, 128 N. W. 1106, 34 L. R. A. (N. S.) 637; Tex. & Pac. Ry. Co. v. Felker, 40 Tex. Civ. App. 604, 90 S. W. 530, and cases cited; Casey v. Ry. Co., 37 Tex. Civ. App. 49, 83 S. W. 20. Michie on Carriers, Sec. 1788, states the following rule:

"Where a carrier burdened with a sudden and extraordinary press of business contracts to transport live stock without stipulating against delays on account of such business or notifying the shipper that such delays might be encountered, the carrier is liable for delays caused thereby; * * * and so liability for injuries by delay in transportation of such property cannot be escaped on the ground that there was an unusual rush of business on its road by the carrier receiving live stock for shipment unless it also shows that it exhausted its resources for providing for the cattle. A carrier which receives live stock for transportation, knowing its facilities are such that loss will result to the shipper, is negligent in undertaking the shipment, so as to make it liable for resulting loss."

Applying the foregoing principles of law to the case at bar, there is evidence tending to show that at the time that defendant accepted the cattle of plaintiff for transportation, the yards at Long Pine were congested, but no evidence that the plaintiff knew that fact or was notified thereof. There is no evidence that the congestion at Long Pine was sudden or unexpected. If defendant knew of the facts beforehand, it was its duty to prevent congestion, if that could be done by the exercise of reasonable care, including deferment of acceptance for transportation for a reasonable

time so as to avoid congestion. We need not determine whether it is or is not chargeable with knowledge of the various shipments on its own road, though we are inclined to think that it is. In short, without extending the discussion, we cannot say that, as a matter of law, the defendant has shown a legal excuse for the delay at Long Pine.

Nor can we say, as a matter of law, that defendant has met the burden of proof to explain the delay outside of that at Long Pine. Counsel for defendant seem to be under the impression that when it is shown that a stop is due to a hotbox, to changing of crews, to meeting a train or to other similar circumstances, the explanation is sufficient, and the prima facie case of negligence is fully met. It was held in the case of Anderson v. Hines, Director General, 110 Kan. 250, 203 Pac. 726, that where the average run of the train should be 15 miles per hour (in that case under a statute) the following causes of delay furnished no excuse; allowing trains to pass; track blocked by trains; waiting for block; taking water and coal; inspecting train; lunch for train crew; waiting for engine; cutting out helper; hotbox; sparks from brake shoe; removal of beam rod; or loading stock for other shippers, for the reason that there is nothing unusual about these matters and the schedule fixed must necessarily take into account a certain amount of delay from such causes. The reasoning applies to the case at bar. It would seem that none of the matters mentioned should be considered as unavoidable accidents in the absence of a showing of an unusual condition, which could not have been prevented by the exercise of reasonable care. The defendant fixed a schedule under which, if followed in the case at bar the cattle should have arrived in Omaha about 6.30 a. m. October 13. Aside from the delay at Long Pine, which has already been fully considered, no unusual conditions have been shown which prevented the defendant from following the schedule, and we cannot, accordingly, disturb the finding of the jury that the defendant was negligent.

3. It is contended that there is no competent evidence
in the case of the market value of the property on October
13, and hence no basis for estimating any damage to plain-
tiff by reason of the difference in the market on that and
the following day. We are cited to the case of Union Pac.
R. Co. v. Perrine, (C. C. A.) 267 Fed. 657, where a witness
based his knowledge of the market value at a distant place
upon some report, the authority of which was not shown,
and the evidence was held to be improper. We have no
such case here. The plaintiff's testimony shows him to be
a stockman with large experience in the handling and ship-
ping of cattle to market. He was asked if he knew the mar-
ket value of cattle on the market at Omaha on October 13,
and he stated that he did. He was then asked to state such
value, which he did. He did not state the basis of his in-
formation, nor was he cross-examined thereon. A claim to
knowledge may reasonably be regarded as prima facie suf-
ficient to show him to be competent. Chamberlain, Modern
Law of Ev., Sec. 2099 c.; 22 C. J. 580; Wilson v. Harnette,
32 Colo. 172, 75 Pac. 395; Railway v. Gluck, 45 Minn. 463,
48 N. W. 194; Moore v. R. Co., 78 Wis. 120, 47 N. W. 273;
Byrd Ins. Co. v. Smyth (Tex. Civ. App.) 157 S. W. 260;
State v. Montgomery, 17 S. D. 500, 97 S. W. 716; North-
eastern etc. R. Co. v. Frazier, 25 Neb. 53, 40 N. W. 609; St.
Louis etc. R. Co. v. Stock Yards Co., 120 Mo. 541, 25 S. W.
399. Counsel say that the uncontradicted evidence shows
that plaintiff was not in Omaha on October 13, and that
hence his evidence is clearly shown to be based on hearsay.
We do not think that it was absolutely essential for plain-
tiff to be present at sales in order to be competent to testify
to the market value of cattle on a certain day, provided that
he gathers his knowledge from reliable sources, and we can-
not assume that he did not so gather it, in view of the state
of the record here. Chamberlain, supra, Sec. 2099, says
that the hearsay rule has been much relaxed in connection
with proof of market value and continues:

"Market value is a fact. The witness may derive his knowledge as to it from the information furnished by others. It may even be learned from an examination of stock or market reports, price lists, trade circulars, sales of similar property and the like. In short, a witness may testify to the value of property if his knowledge of it has been derived through the general avenues of information to which the ordinary business man resorts, to inform himself as to values for the proper conduct of his affairs."

4. We come now to the most difficult question in the case —as to whether there is competent evidence in the record to prove the weight of the cattle, upon which, together with the value, the assessment of damages at least as to the item for $906.30, for the difference in the market price on October 13 and on October 14, is based. Plaintiff testified that he shipped 575 head of cattle, and he was then asked the total weight. But before answering he was cross-examined and testified as follows:

"Q. Did you weigh the cattle personally? A. I didn't weigh them personally. Q. They were weighed by somebody down at South Omaha? A. They were. Q. And all you know about the weight is what they told you, isn't it? A. Yes."

The proposed testimony of the witness on the weight was thereupon objected to as hearsay, but the objection was overruled, and the witness permitted to answer that the cattle weighed about 360,000 pounds. The objection should have been sustained. It should not need any argument on the part of this court that the testimony was clearly hearsay. The erroneous ruling cannot be defended upon any principle of necessity or expediency, as in cases where the hearsay rule is relaxed. To permit the weight of cattle weighed at a distant market to be established upon pure hearsay testimony would, undoubtedly, ultimately lead to the grossest of frauds. If the foregoing testimony were all

the testimony in the record on the point in question, we should have to reverse this case as a matter of course. But that is not so. The plaintiff had testified, without objection, that the cattle were shipped in 18 cars, not overcrowded, each car with the minimum capacity of 22,000 pounds, making for all the cars, if fully loaded, at least 396,000 pounds. Plaintiff stated, it is true, that the account sales showed that the cattle weighed less than the minimum; how much less, he did not state; but the effect of the whole testimony might well be taken to be, that the total weight of the cattle was not much below the minimum mentioned. The evidence further disclosed the long experience of plaintiff in handling cattle and shipping to market. He claimed to be a good judge of cattle and to be able to make a good estimate of their weight. In fact he claimed to be so competent as to be able to judge the shrinkage of cattle by reason of the ordinary haul to market and the shrinkage caused by a too lengthy confinement. It is no doubt true that, at least in the western states where live stock is handled in great numbers, there are men who can make a remarkably close approximation to the actual weight of cattle. Whether the plaintiff was so qualified was a question for the jury. The further examination of the plaintiff as to the weight of the cattle in question was as follows:

"Q. Mr. Graham, during the noon hour, the examination of your sales slips memorandum, did you figure out the quality and character of these cattle? A. I did. Q. Their weights; will you read that into the record, or tell the jury what the character of these cattle were; their numbers and weights and prices? Mr. Dressler: I object to that as incompetent and not the best evidence; no foundation laid, hearsay. By the Court: Overruled. Exception. A. (referring to paper) There were eighteen steers" etc.

And the witness thereupon proceeded to tell the classes of cattle, the number in each class and the total weight of each class, and the price thereof. The witness was not

asked upon cross-examination or otherwise whether he based his figures solely upon the paper before him, or whether he had, during the noon hour, examined the paper, refreshed his recollection, made his own calculation and was giving that to the jury. On cross-examination, in fact, he was asked as to the weights and as to shrinkage, upon the apparent assumption that the weights testified to were correct. No motion was made to strike out his testimony, and no attempt was made to show the weight of the cattle to have been different from that testified to by the witness. In view of all the evidence in the case it is not clearly apparent that the testimony of the witness last referred to was hearsay. We feel morally certain that the weights given by the witness were correct, as evidently counsel for defendant did on the trial of the case, and upon consideration of the whole case, we have concluded, though with some misgivings, that we ought not to reverse the case because of the state of the record on the point in question.

5. It is assigned as error that the court refused to give the jury the following instruction:

"You are instructed that defendant had the right to establish schedules for the transportation of livestock during the stock shipping season and you are further instructed that such schedules are presumed to be reasonable."

The court, however, gave instruction No. 8 as follows:

"If you find from the evidence that the defendant substantially complied with its stock shipping schedule at the time in question, plaintiff cannot recover on the claim of unreasonable delay."

It will be noted that the instruction given goes much further than the instruction asked. The evidence is not contradicted that a schedule existed, and the court not only assumed, in the latter instruction, the right of the defendant to fix its schedule, but told the jury that that was to be,

its guide in determining whether there was an unreasonable delay, without reference to whether the schedule was reasonable or not. Without approving the instruction given, it is clear that under the circumstances there was no error in not giving the instruction asked.

6.  Counsel for defendant assign as error that the court failed to instruct the jury as to the measure of damages and consider it "remarkable that a damage suit should be tried in the district court with no instructions on the measure of damages." The measure of damages in this case, however, is simple and easily understood. Counsel for defendant offered a number of instructions, but none on the measure of damages, and they evidently considered that subject unimportant. The record does not disclose that any request whatever was made for the court to instruct the jury thereon, and no exception was taken to the action of the court. We do not think that under the circumstances any reversible error was committed by the court. 4 C. J. 542, Sec. 2339. An examination of the record herein shows clearly that the jury were in no way misled. Plaintiff, if he was entitled to recover at all, was entitled to recover the difference between the value of the stock at the time and place of delivery in an uninjured condition and their value in the depreciated condition in which they were delivered. 10 C. J. 396. This is determined, in this case, by the value of the excess shrinkage. If plaintiff was entitled to recover upon the item at all, he was further entitled to recover the difference in the market price between October 13th and October 14th. Elliott on Railroads, Vol. 5, Sec. 2750 (3rd Ed.) Plaintiff, further, if entitled to recover at all, was entitled to recover interest. City of Rawlins v. Murphy, 19 Wyo. 238, 253, 115 Pac. 436. Now there is no dispute in the evidence on any of these items. The minimum shrinkage of the 575 cattle shipped, as shown by the evidence, was 30 pounds each. Plaintiff claimed in his petition only a shrinkage of 25 pounds each. The average price brought on the market was $8.54 per 100 pounds. Plaintiff claimed

only $8.52 per 100 pounds, or a total of $1224.75 on this item. The evidence shows that the difference in the market price between October 13th and October 14th ranged from a minimum of 25 cents per 100 pounds to 75 cents per 100 pounds. Plaintiff claims only the minimum, or $906.30. The total claimed is $2131.00 with interest from October 14, 1919, which amounts to $284.13 up to June 13, 1921, when the verdict herein was returned, which, added to the former sum, amounts to $2415.13, the amount of the verdict. Hence, had the proper instruction on the measure of damages been given in this case, the jury would have had to find a verdict for the latter sum, if they found for plaintiff at all, and it is accordingly clear that the defendant was in no way prejudiced by the error of which counsel complain.

Finding no prejudicial error in the record, the judgment of the lower court should be affirmed, and it is so ordered

POTTER, Ch. J., and District Judge WM. A. RINER, the latter sitting in place of Kimball, J., concur.

NOTE—See 4 C. J. pp. 542, 999; 10 C. J. pp. 95, 98, 99, 290, 292, 295, 301, 304, 305, 396, 400; 22 C. J. pp. 214, 523, 580; 38 Cyc. p. 1711.